# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PAMELA HARRIS,                          )
                                        )
            Plaintiff,                  )          Case No. 09 C 3071
                                        )
    v.                                  )          Judge Joan H. Lefkow
                                        )
STATE OF ILLINOIS, DEPARTMENT           )
OF CORRECTIONS, DEBBIE DENNING,         )
and MARY SIGLER,                        )
                                        )
            Defendants.                 )

## OPINION AND ORDER

Plaintiff Pamela Harris, an African-American woman, sued her former employer the

Illinois Department of Corrections ("IDOC") and three current and former IDOC employees,

alleging various counts of racial discrimination and retaliation in violation of 42 U.S.C. § 1981

("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title

VII"), 42 U.S.C. § 1983 ("Section 1983"), and the Illinois State Officials and Employees Ethics

Act, 5 Ill. Comp. Stat. 430/1 *et seq.* ("the Ethics Act").[1]  Defendants move for summary

judgment on all claims.  (Dkt. 112.)  For the following reasons, summary judgment is granted in

favor of defendants on all claims except for Harris's claim for retaliatory termination under Title

VII and Harris's claim under the Ethics Act.[2]

---

[1] Harris also asserted claims under the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/1-101, *et seq.*, the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/1-1, *et seq.*, and Illinois common law.  The court dismissed these claims in its Opinion and Order dated November 9, 2010.  (*See* dkt. 34.)

[2] The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3).  Venue is proper in this district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b).

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323-24.

# BACKGROUND[3]

## I.    Early IDOC Employment

Harris started at IDOC as an officer at the Joliet and Stateville Correctional Centers in 1992. After working at various IDOC facilities, Harris was promoted to the position of center supervisor for the Jessie "Ma" Houston Adult Transition Center ("JMH") in Dixmoor, Illinois in 2004. In connection with this promotion, Harris became a Senior Public Service Administrator ("SPSA"). SPSAs are at-will employees that can be terminated at any time.[4] Barbara Hurt, the deputy director of the community corrections centers in JMH's area, directly supervised Harris while she was at JMH.

## II.    Dwight Correctional Center

After about two years at JMH, Harris was offered a position as assistant warden of operations at Dwight Correctional Center ("Dwight"), a women's facility in Dwight, Illinois. Debra Denning, the deputy director of IDOC's division of women and family services, and Toyia Sims, special assistant to the IDOC director, recruited Harris for the position.[5] Harris accepted and was transferred to Dwight in April 2006. The appointment was approved by the director of

---

[3] Unless otherwise noted, the facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. They are taken in the light most favorable to Harris. In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to the resolution of this motion. Harris attempts to overcome summary judgment by listing disputed facts (*see* dkt. 125-1 ("Pl. Resp.") at 17-18) but disputed facts alone are insufficient. They must be material to the dispositive issues in the case and, when read in the light most favorable to Harris, must be sufficient to allow a reasonable jury to find in her favor.

[4] Harris remained an SPSA until she was terminated by IDOC in 2008.

[5] Harris had been asked by Denning to join the division of women and family services in the past, but Harris had declined, in part because she was not sure she wanted to work with female inmates and because the women's facilities were outside Chicago. (*See* dkt. 123 at 3, ¶ 4.)

IDOC, Roger Walker.[6]  Harris was the first African-American assistant warden of operations at Dwight.

### A.     Harris's Complaints About Dwight's Operation and Warden Sigler

While at Dwight, Harris reported directly to Dwight's warden, Mary Sigler-Quigley ("Sigler").  Sigler reported to Denning, who reported to the IDOC director, Walker.[7]  Sims, who was Walker's assistant, was not in Harris's chain of command.

Soon after arriving at Dwight, Harris told Denning and Sigler that there were serious issues with Dwight's operation, including issues with chain of command, security, and inmate movement.  Harris also believed that Sigler covered up major security breaches and protected white corrections officers from discipline.[8]  When Harris went over Sigler's head to report these incidents directly to Denning, Harris claims she was ostracized by Dwight personnel.  Harris also repeatedly complained to Sims about Sigler.  Harris believed that that Sims was communicating her complaints to Walker.[9]

In October 2006, Denning called Harris and asked to discuss her complaints about Sigler.  Harris testified that she told Denning that Sigler was discriminating against her and Denning responded that she knew there was a "good ole girl network" at Dwight but did not know what to

[6] Walker was an individual defendant in this action but was dismissed after he passed away in 2012.

[7] At the beginning of the relevant time period, Denning reported indirectly to Walker.  She later became a direct report.

[8] Harris cites the termination of Milton Luster, an African-American corrections officer, as an example of Sigler's discriminatory conduct.  Sigler suspended Luster without pay and recommended his termination because of allegations that he sexually harassed a female subordinate.  *See Luster* v. *Ill. Dep't of Corrections*, 652 F.3d 726, 729 (7th Cir. 2011).  The Seventh Circuit rejected Luster's discrimination claims.  *See id.* at 733.

[9] In late 2006, Harris asked Sims for a transfer out of Dwight, but there were no openings in the northern division of IDOC.  The defendants argue that Sims did not relate anything to Walker beyond Harris's request to be transferred.  This is supported by Sims testimony.  (*See* dkt. 114, ex. 13 ("Sims Dep.") at 42:10-16, 50:6-11, 86:12-87:7.)

do about it.  (Dkt. 114, ex. 1 ("Harris Dep.") at 85:1-6.)  Defendants deny that Denning made the "good ole girl" comment and deny that Harris mentioned discrimination to Denning on the phone call.  (*See* dkt. 123 at 13, ¶ 21; Denning dep. 101:3-102:16.)

At the end of the conversation, Denning asked Harris to write down her complaints in an email.  Harris never did so.  On October 19, 2006, Sigler sent Denning an email providing her perspective on the issues between her and Harris.  On November 2, 2006, Denning sent an email to other IDOC employees (not including Walker) outlining the concerns that Harris had expressed about Dwight.  The email lists seven examples of Harris's concerns, but the only mention of racial tension is Harris's complaint that a corrections officer at Dwight allegedly had a swastika tattoo.  (*See* dkt. 114 ("DSOF"), ex. 16.)  Denning also wrote that both Harris and Sigler had expressed to her that they did not trust each other.  (*See id.*)

## B.    Denial of Secretarial Support

One of Harris's complaints was that Sigler refused to allow her to hire a replacement secretary when her secretary left and refused to allow Harris to use Superintendent Duane Tucker to help with administrative assignments.  Harris asserts that the previous assistant warden, a Caucasian male, had been able to use Tucker.[10]  Defendants dispute the claim that a replacement secretary was not hired.  They argue that Tucker was busy with his own work and that Denning recommended other employees who could assist Harris.  (*See* dkt. 123 at 9, ¶ 15; Denning dep. at 66:20-27:18; 83:19-84:5; 153:14-21.)

---

[10] Harris also complains that Sigler did not provide sufficient training when Harris transferred to Dwight, and she asserts that her predecessor had received training.  (*See* dkt. 123 at 6-7, ¶ 11.)  She states that IDOC was required to provide certain training under an administrative directive, but she does not provide the language of the directive.  Further, Harris stated in her deposition that she knew that the previous assistant warden received training because it was stated in his performance evaluation, but she does not provide the performance evaluation and her testimony about its contents is hearsay.  (*See* Harris dep. at 65:20-66:14.)  Given the limited information presented, it is impossible to conclude that Harris's training differed from that of other similarly situated employees.

### C.    Inmate Confinement Incident and Oral Reprimand

On November 21, 2006, Harris disciplined a Dwight inmate by asking an officer to put the inmate in a cell without access to water or a toilet.  When asked later about what to do with the inmate, Harris told the officer she would call back.  She did not call back, and the inmate remained in the cell for five hours.  A few days later, the inmate complained to Sigler and Sigler asked the inmate to write a letter detailing the incident.  Sigler forwarded the letter to Denning because she did not have authority to discipline Harris.  Denning forwarded the letter to an external investigator.  The investigation concluded that Harris violated IDOC rules by confining an inmate for an extraordinary length of time and failing to write a disciplinary report.  Walker's office instructed Denning to give Harris an oral reprimand based on her actions, which Denning did on April 13, 2007.  The reprimand did not result in a reduction in pay or benefits, but record of it was placed in Harris's personnel file.

### D.    Racial Slur Incident

On December 11, 2006, Harris received a report from a shift commander that a corrections officer called Harris a racial slur.  Harris relayed the report to Sigler.  Sigler assigned Lieutenant Winters[11] to investigate.  Winters concluded that it was "her word against her word." (Dkt. 116 ("PSOF") at 23-24, ¶ 45.)  The next week Sigler referred the incident to the external investigations and intelligence department of IDOC.  The resulting investigative report concluded that the allegation could not be substantiated.  (*See* DSOF, ex. 27.)

---

[11] Harris argues that Sigler's appointment of Lieutenant Winters to investigate was suspicious because Harris had previously reported to Denning that Winters engaged in cover-ups of misconduct at Dwight.  (*See* dkt. 123 at 15, ¶ 24.)  This argument is unconvincing because Sigler later referred the incident to external investigations.

### E.    Kicking Incident

On December 21, 2006, Harris received a report from an inmate that a corrections officer had kicked the inmate a couple days earlier.  Harris reported the incident to Denning and prepared an incident report.  Harris alleged that Sigler took steps to cover up the incident.  An investigation by the IDOC external investigation department resulted in the discipline of one officer.  Denning emailed external investigations and requested that they also investigate Harris's allegations of Sigler's cover-up and a botched investigation.  (*See* DSOF, ex. 25.)  Denning suggested in the same email that she could temporarily reassign Sigler to another facility until the investigation was complete.  (*Id.*)  The external investigations and intelligence department declined to investigate further.  (*Id.*)  Harris noted to Denning that the treatment of the officer who kicked the inmate differed from the treatment of an African-American officer who immediately was locked out when he was accused of sexual harassment.[12]  *See supra*,  n.9.

### F.    Complaints to John Harris and Illinois Senator Mattie Hunter

In January 2007, Harris toured the Illinois governor's office and spoke to Governor Blagojevich and his aide, John Harris.  She testified that she told the Governor and John Harris that "there was a lot of discrimination against African-Americans at Dwight Correctional Center and a lot of illegal practices at Dwight" and that she "was being harassed."  (Harris dep. at 117:6-10; 118:19-24.)  John Harris never followed up with Harris about her complaints and Harris does not know whether the Governor or John Harris did anything with the information or whether

---

[12] A few months later Harris also reported two incidents of prisoner mistreatment by a nurse that Harris believed were racially motivated.  She testified that she felt Denning was irritated by her repeated requests for investigations.  Harris also mentions in passing other instances of alleged cover-ups at Dwight.  The court finds these instances immaterial to the claims at issue because the claims lack sufficient detail.  Moreover, as described in more detail in Part II.B.2(b) of the court's analysis, to the extent the instances support a finding that Sigler was biased, they are irrelevant because Sigler's input into the adverse employment actions was too attenuated to be considered under the cat's paw theory of liability.

anyone at IDOC was informed of her communications with the Governor and John Harris.  (*Id.* at 119:1-20.)

Later the same day, Harris attended a reception and met Illinois State Senator Mattie Hunter.  Harris testified that she told Senator Hunter that things at Dwight were not good. (Harris dep. 120:4-7.)  Harris did not say anything further at the reception but testified that she followed up with an email to Senator Hunter that described issues at Dwight.  (*Id.* at 120:8-16.) Harris does not recall what she included in the email to Senator Hunter.  (*Id.* at 120:17-24.) Senator Hunter did not respond to the email and Harris testified that she did not know if Senator Hunter did anything with the email.[13]  (*Id.* at 121:1-6.)

### G.    Performance Evaluation

In early 2007, Denning and Sigler were asked to prepare a performance evaluation of Harris for the time she was at Dwight in 2006-2007.[14]  Sigler prepared an initial draft of the evaluation and rated Harris as "unacceptable."  Denning disagreed with this rating and it was changed to "acceptable."  Sigler testified that she believed Denning's superiors were responsible for changing the rating.  (*See* Sigler dep. at 42:13-46:25.)  Because Harris received an acceptable rating, her merit-based raise was less than it would have been if she had been ranked "accomplished" or "exceptional."  (*See* Denning dep. at 73:5-7.)  The highest possible ranking, "exceptional," would have been accompanied by a $200 per month raise.   Harris's "acceptable" rating garnered a $100 per month raise.

---

[13] Although Harris testified that she saw emails that supported an inference that her comments to Senator Hunter were relayed to IDOC (*see id.* 121:7-122:16), Harris's testimony about the content of the emails is hearsay and she points to no other evidence (not even the referenced emails) that her complaints to Senator Hunter were relayed to IDOC.  (*See* dkt. 123 at 17, ¶ 27.)

[14] As will be discussed below, when Denning and Sigler prepared this evaluation Harris had already transferred out of Dwight and back to JMH.

Harris received the evaluation on May 3, 2007. Harris disagreed with the assessment and filed a rebuttal the next day.

## III.    Transfer Back To JMH

In February 2007, Walker, the IDOC director, asked Denning about the situation at Dwight and the relationship between Sigler and Harris. Denning told him that she had been unable to build a team at Dwight and that Harris was unhappy. Walker informed Denning that he was likely going to transfer Harris back to JMH. On February 26, 2007, Denning sent an email to Walker's executive assistant and other IDOC executives about Harris's concerns with Dwight's operation. (*See* PSOF, ex. F.) In the email Denning detailed Harris's concerns about inmate treatment (including allegations that an inmate was called a racist slur) and the fact that Harris did not trust Sigler and thought she covered for her friends. (*Id.*) Denning noted that she had raised Harris's concerns to IDOC executives and had confirmed that there had been no increase in inmate complaints at Dwight. (*Id.*) She also observed that Harris had performed unscheduled inspections at Dwight and had not noted any inmate concerns after these inspections. (*Id.*) Walker's assistant responded, "The director has told me he will address all issues regarding Harris." (*Id.*)

On or around February 27, 2007, one of Walker's assistants called Harris and directed her to report to JMH on March 1, 2007 where she would be the assistant supervisor. Back at JMH, Harris reported to Darryl Coleman, the acting supervisor of JMH. Coleman reported to Hurt.[15] Hurt had been Harris's direct supervisor during Harris's previous stint as supervisor of JMH. Walker appointed Tucker, an African-American, to Harris's former position as assistant warden of operations at Dwight.

---

[15] There appears to be a dispute about when Hurt became Coleman's supervisor at JMH. This dispute is not material to the disposition of the summary judgment motion.

Harris testified that she later discussed her transfer to JMH with Sims and Sims told Harris, "You overstepped your boundaries." (Harris dep. at 109:6-12.) Sims confirmed that she told Harris that she had overstepped her bounds and should pick her battles and that Harris complained of racial discrimination during the discussion.[16] (*See* Sims dep. at 61:3-63:20.)

## IV. IDHR Charge

In August 2007, Harris filed a charge with the Illinois Department of Human Rights ("IDHR") asserting that the oral reprimand she received while at Dwight, her transfer back to JMH, and her May 2007 performance evaluation were discriminatory and/or retaliatory. Sometime around October 2008, IDOC offered to settle her charge by offering her a position as assistant chief of inmate records.[17] Harris rejected the offer.

---

[16] Harris also testified that she asked Sims whether the transfer was because of her race, and Sims responded, "It is what it is." (Harris dep. at 110:10-12.) Harris testified she then said "White is right black get back," to which Sims responded, "You lucky they didn't find you hanging from one of those trees down there or strung out across one of those fences." (*Id.* at 111:9-15.) Sims denied expressing any opinion as to whether or not there was racial tension between Sigler and Harris. (Sims dep. at 62:20-63:4.) In any event, Sims' purported statements are hearsay and do not fall into the exception set forth in Federal Rule of Evidence 801(d)(2)(D) for admissions of party opponents because they were not made within the scope of Sims' employment. Sims was special assistant to the director of IDOC. She was not involved in the day-to-day operations of facilities and she did not oversee employment decisions. (*See* PSOF at 6, ¶ 13; Sims dep. at 44:23-45:2.) Sims' statements thus will be disregarded as inadmissible hearsay. *See Stephens* v. *Erickson*, 569 F.3d 779, 792-94 (7th Cir. 2009) (out of court statement by commissioner's administrative assistant was inadmissible); *Halloway* v. *Milwaukee Cnty.*, 180 F.3d 820, 825 (7th Cir. 1999) (liaisons to chief judge were not acting within scope of their duty with respect to comments that judge and other defendants wanted to "get rid" of plaintiff); *Williams* v. *Pharmacia, Inc.*, 137 F.3d 944, 950-51 (7th Cir. 1998) (declarants were not agents of employer for purpose of making managerial decisions impacting employment and thus their statements regarding pattern of discriminatory decisions were inadmissible hearsay).

[17] Harris also testified that in November 2007 Sims asked her to meet with Victor Roberson, apparently an employee of the Illinois governor's office, and Roberson offered her a promotion to center supervisor at JMH. (*See* Harris dep. at 345:1-349:8.) Harris does not know whether the proffered promotion was an attempt to settle her IDHR charges. (*Id.* at 346:24-347:3.) Harris testified that after her conversation with Roberson, she discussed the job offer with Sims. (*Id.* at 349:9-350:21.) Defendant does not admit or deny that the conversation with Roberson occurred, but does state that Roberson was not an IDOC employee and that Walker was not aware of any meeting between Harris and Roberson. (Dkt. 123 at 21, ¶ 36.) Sims, on the other hand, denied at her deposition that she facilitated the meeting or that she spoke to Harris after the meeting. (Sims dep. 65:10-66:17.) Although Harris recites facts about

## V.    JMH Incident And Termination

On October 17, 2008, Harris reprimanded a corrections counselor at JMH.  While the materials submitted to the court contain differing descriptions of the incident, from what the court can glean, it is uncontested that Harris reprimanded Counselor Denise Holt because Harris thought Holt was covering for late co-workers.  Hurt, the direct supervisor of Harris's boss, was at JMH at the time of the incident and painted a serious picture of the incident in the affidavit she submitted to the court.  (*See* DSOF, ex. 10 at 4, ¶15.)  Hurt claimed that she personally observed Harris screaming at Holt in front of offenders and other employees and that Holt started crying during the incident.  (*See id*.)  The report that Holt filled out after the incident provides a different picture, indicating that the confrontation occurred over the telephone.  (*See* DSOF, ex. 25 at 1 ("I called Ms. Harris and I was chastised . . . . Ms. Harris stated aggressively that I should never tell my Subordinates what she tells me etc. and that I was unprofessional for doing such and I should not have transferred that call to her—more was said but I could not remember the entire conversation because I was heated.").)  Harris's account of the incident aligns with Holt's incident report.  (*See* dkt. 117, ex. A at 4, ¶ 12 ("My conversation that day was by telephone . . . . Hurt could not have observed me during this telephone call because she was not with me.  I was alone in my office during the telephone call.").)

Immediately after this incident, Hurt called Walker and requested that he discharge Harris.  Over two months later, on December 1, 2008, Harris was put on administrative leave. She was terminated two weeks later.  Harris filed another IDHR charge on December 17, 2008 asserting that she was discharged in retaliation for filing her previous charge with IDHR.  In

this incident in her response brief, she fails to connect this alleged meeting and offer to any argument and the court thus finds it immaterial to the issues at hand.

April 2009, Harris received right to sue notices from the Equal Employment Opportunity Commission. She filed this suit on May 21, 2009.

## ANALYSIS

### I.     Discrimination Under Title VII

Title VII makes it unlawful for employers to discriminate against employees because of their race. 42 U.S.C. § 2000e, *et seq.* "In order to succeed in a Title VII lawsuit, a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action . . . and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan* v. *SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (citing *Coleman* v. *Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)). In responding to a defendant's motion for summary judgment, a plaintiff may proceed via the "direct" or "indirect" method. The Seventh Circuit recently cautioned courts against getting lost in the "technical nuances" of the two methods, emphasizing that the "central question at issue is whether the employer acted [against the plaintiff] on account of the plaintiff's race." *Morgan*, 724 F.3d at 996-97. Harris proceeds under the direct method.[18]

### A.     Adverse Employment Actions

In order to show discrimination, a plaintiff must identify material differences between her treatment and that of other employees (often termed "adverse employment actions") as a

---

[18] It is perhaps most accurate to say that Harris advances her argument under a hybrid direct/indirect method. (*See* Pl. Resp. at 8-9 ("Importantly, as here, 'when a plaintiff in a discrimination case has direct evidence of discrimination as well as the indirect evidence required to make out a prima facie case under *McDonnell Douglas*, he does not have to show that either approach, taken in isolation from the other, makes out a prima facie case—he can combine them.") (quoting *Simple* v. *Walgreen Co.*, 511 F.3d 668, 670-71 (7th Cir. 2007)).) In weighing Harris's claims, the court will apply the more flexible approach recently espoused by the Seventh Circuit. *See Chaib* v. *Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) (referring to "less rigid framework" suggested by recent Seventh Circuit cases). In any event, because Harris fails to name any comparators in her summary judgment response (*see* Pl. Resp. at 11-12 & n.13), she cannot succeed under the indirect method. *Chaib*, 744 F.3d at 984 ("[T]he indirect method requires the identification of similarly situated comparators[.]").

threshold.  *See Chaib* v. *Indiana*, 744 F.3d 974, 982 (7th Cir. 2014).  "[A]lthough the definition of an adverse employment action is generous, an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm."  *Id.* (quoting *Nagle* v. *Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009)).  Adverse employment actions generally fall into three categories:  "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge."  *Barton* v. *Zimmer*, 662 F.3d 448, 453-54 (7th Cir. 2011).  The determination of whether an employment decision constitutes an adverse action is highly fact specific.  *See Oest* v. *Ill. Dep't of Corrections*, 240 F.3d 605, 612 (7th Cir. 2001).

Harris alleges four adverse actions:  (1) her April 2007 oral reprimand, which she received for holding an inmate in a cell with no water or toilet access for five hours in November 2006; (2) her May 2007 performance evaluation based on her time at Dwight; (3) her February 2007 transfer from Dwight to JMH; and (4) her December 2008 termination.  Defendants agree that Harris's termination was an adverse action but assert that the other events were not adverse.

### 1.     Oral Reprimand and Performance Evaluation

Oral reprimands and performance evaluations are only considered adverse actions if a plaintiff shows that they tangibly and adversely affected her employment.  *See Chaib*, 744 F.3d at 984, 987 (performance evaluation or reprimand without more is not an adverse employment action); *Oest*, 240 F.3d at 613 (oral reprimand did not implicate "sufficiently 'tangible job consequences' to constitute an independent basis of liability under Title VII") (quoting *Sweeney*

v. *West*, 149 F.3d 550, 556 (7th Cir. 1998)); *Smart* v. *Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (adverse performance rating alone is not adverse action).

It is undisputed that Harris did not receive a reduction in pay or benefits as a result of her oral reprimand. Harris argues that the reprimand reduced the likelihood that she would receive a promotion within IDOC or be hired by another employer such as the Illinois State Police. (*See* Harris Dep. at 254:13-255:18.) Although a reprimand that results in "ineligibility for job benefits like promotion" may constitute an adverse employment action, *Oest*, 240 F.3d at 613, Harris does not contend that her reprimand would foreclose promotion all together—only that it could impair her ability to advance. This consequence is not sufficiently tangible to transform the oral reprimand into an adverse employment action.[19] *See Mitchom* v. *Bi-State Dev. Agency*, 43 F. App'x 958, 959 (7th Cir. 2002) (speculative consequences insufficient to transform reprimand into an adverse employment action) (citing *Oest*, 240 F.3d at 613; *Sweeney* v. *West*, 149 F.3d 550, 556 (7th Cir. 2001)); *Thomsen* v. *Romeis*, 198 F.3d 1022, 1028 (7th Cir. 2000) (describing possibility of future discipline and inability to compete for jobs as a result of reprimands as "speculative"); *see also Banks* v. *Archer/Amer. Wire*, No. 04 C 3026, 2005 WL 2007227, at *13 (N.D. Ill. Aug. 17, 2005).

With respect to the performance evaluation, Harris argues that her "acceptable" rating resulted in "the denial of a higher raise." (Pl. Resp. at 14.) The defendants argue that the evaluation did not directly impact the raise because the IDOC director had discretion to alter the raise recommended by the evaluation. Viewing the facts in the light most favorable to Harris and making inferences in her favor, the court concludes that a higher rating on the performance evaluation would most likely have led to an increase in Harris's monthly salary. (*See* Denning

---

[19] Even if the oral reprimand was an adverse employment action, as discussed *infra* in Part II.C.1, Harris provides no facts that could cause a reasonable jury to find that IDOC's reasons for the reprimand were pretextual.

Dep. at 73:23-75:21 (testifying that a higher rating would normally result in a higher raise but noting that the director of IDOC made the final decision).)

Although a better evaluation would have resulted in a small incremental merit-based raise, the denial of compensation is only an adverse action if the compensation is an expected and relied-upon element of an employee's salary. *See Fyfe* v. *City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (distinguishing between bonuses, which are "sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer" and ordinary course raises) (quoting *Hunt* v. *City of Markham, Ill.*, 219 F.3d 649, 654 (7th Cir. 2000)); *see also Rabinovitz* v. *Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996). If an employee is not entitled to additional compensation in the form of a raise, failure to receive that raise is not an adverse action. *See Miller* v. *Am. Family Mut. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000) (affirming district court's holding that, absent entitlement, employee's failure to receive additional raise after receiving largest raise in her department was not an adverse action).

Here IDOC's scaled raises based on yearly performance evaluations straddle the line between a discretionary bonus and an ordinary course raise. Harris, however, presents no evidence that she could reasonably expect or rely on the additional compensation she would have received had her performance review been better. In fact, Harris received an "acceptable" rating on an interim evaluation in 2004, which indicates that she was aware that lower ratings than "accomplished" were possible. (*See* DSOF, ex. 11.) There is no disputed issue of fact that would allow a reasonable jury to conclude that the performance evaluation was an adverse action.

For the reasons discussed above, neither the oral reprimand nor the performance evaluation constitute adverse actions for the purpose of Harris's discrimination claim.

### 2.     2007 Transfer to JMH

Harris argues that her 2007 transfer from assistant warden of operations at Dwight to assistant supervisor at JMH was an adverse action because it was a *de facto* demotion.  Transfers that do not result in demotion are not adverse actions.  *See O'Neal* v. *City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004).  Evidence that a transfer is a demotion includes a decrease in salary, inferior title, change in benefits, or diminished responsibilities.  *Weber* v. *Univs. Research Ass'n, Inc.*, 621 F.3d 589, 594 n.3 (7th Cir. 2010) (citing *Oest*, 240 F.3d at 612-13).  Harris's transfer did not result in a reduced salary, and her compensation subsequently increased due to raises and bonuses.  Her title, however, did change.[20]  Before she was transferred to Dwight, she had been the center supervisor at JMH.  After a promotion to assistant warden at Dwight, she returned to JMH as *assistant* supervisor.[21]  This is sufficient for the transfer to qualify as an adverse action.  Thus the court will proceed to consider whether two adverse actions—Harris's February 2007 transfer from Dwight to JMH and her December 2008 termination—were discriminatory.

### B.     Cat's Paw Liability

As noted above, Harris proceeds under a flexible direct method approach to demonstrate that she was the victim of discrimination.  "'Direct proof [of employment discrimination] includes both evidence explicitly linking an adverse employment action to an employer's discriminatory animus . . . and circumstantial evidence that would permit the trier of fact to infer that discrimination motivated the adverse action."  *Morgan*, 724 F.3d at 995 (citations omitted).

---

[20] The defendants argue that Harris's title did not change because she was a SPSA in both positions.  This argument is unavailing as there appears to be a clear hierarchy within the SPSA rank.

[21] The defendants argue that Harris's testimony about her job responsibilities at Dwight is inconsistent.  In order to argue that she was discriminated against, Harris claims that she had little independent responsibility at Dwight, but in order to argue that the transfer was an adverse action, she states that she had greater responsibility at Dwight than she did upon her return to JMH.  It is not necessary to perform a close comparison of the exact responsibilities at each position because Harris's change in title is sufficient to evidence an adverse action.

"If the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Id.* at 996.

One obstacle that Harris faces is that she provides no direct or circumstantial evidence that the individual who actually made the decisions to transfer her to JMH and to terminate her, IDOC director Walker, acted with discriminatory intent.[22] Thus, although not articulated in her papers, Harris must proceed on her discrimination claim under a cat's paw theory and show that Walker's decision was tainted by discrimination in the ranks below him.[23] *See Shager* v. *Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (introducing cat's paw analysis).

"As applied in this circuit, 'cat's paw' liability may be imposed on an employer 'where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Smith* v. *Bray*, 681 F.3d 888, 897 (7th Cir. 2012). In order to show liability based on a cat's paw theory, the "non-decisionmaker's actions [must be] a 'causal factor,' based on common-law proximate cause principles, in the [adverse action]." *Id.* at 900 (citing *Staub* v. *Proctor Hosp.*, --- U.S. ---, 131 S.

---

[22] Harris does not dispute that Walker was the ultimate decisionmaker in both adverse actions. (*See* PSOF at 26-27, ¶ 53; *id.* at 33-34, ¶¶ 66-68.) Harris's sole complaint about Walker is that at Dwight's Black History Month Ceremony in February 2007, Walker asked Harris, "What is going on?" Harris claims she replied, "Do you really want to know?" and Walker responded, "Never mind, I don't want to hear it." (*See* dkt. 123 at 18, ¶ 29.) A reasonable jury could not infer that Walker acted with discriminatory animus based on this exchange.

[23] Harris argues that Denning's and Sigler's involvement in the decisions to transfer and terminate her is sufficient to render them "decisionmakers." The cases that she relies on, however, distinguish between form and substance. *See Lewis* v. *City of Chicago*, 496 F.3d 645, 649, 652 (7th Cir. 2007) (plaintiff's supervisor was decisionmaker where, even though he consulted with his supervisor, the record contained evidence that he himself removed plaintiff from list of officers allowed to attend event); *Little* v. *Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004) ("[S]omeone who merely recommends a termination is considered a decisionmaker for purposes of assessing pretext when he was the one functionally, if not formally, responsible for such decision."). In Harris's case, neither Denning nor Sigler recommended Harris's transfer or termination. This case is thus distinguishable from *Lewis* and *Little* because neither Denning nor Sigler was functionally responsible for the adverse decisions.

Ct. 1186, 1193, 179 L. Ed. 2d 144 (2011)).  Some Seventh Circuit opinions have gone so far as

to require that the decisionmaker be "totally dependent on another employee to supply the

information on which to base that decision."  *Hicks* v. *Forest Preserve Dist. of Cook Cnty.*, 677

F.3d 781, 790 (7th Cir. 2012) (quoting *Brewer* v. *Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908,

918 (7th Cir. 2007)).

The determination of whether cat's paw liability is appropriate depends on the specific

facts surrounding the adverse employment decision.  In *Smith*, for example, the Seventh Circuit

found that an employee may have intentionally brought about an adverse employment action

where that employee was substantially involved at every stage of the plaintiff's complaints and

disciplinary issues, and the decision to terminate the plaintiff.  *See Smith*, 681 F.3d at 900.  The

plaintiff in *Smith* provided evidence that the employee regularly participated in termination

decisions, had frequently spoken to decisionmakers prior to the plaintiff's termination, and wrote

the report requesting termination.  *See id.*  In *Hicks*, the Seventh Circuit found that a plaintiff had

presented sufficient evidence for a jury to find that an employee induced the plaintiff's demotion

where the demotion was based on 28 disciplinary forms received from or approved by that

employee.  *Hicks*, 677 F.3d at 790.  Harris's termination and transfer must be separately

analyzed to determine whether Denning's or Sigler's actions led to Walker's decision.[24]

### 1.    Decision to Transfer Harris

Defendants claim that Walker decided to transfer Harris in late February 2007 because

she was not working well with the staff at Dwight and she had repeatedly requested a transfer.

Walker made the decision to transfer Harris within weeks of talking to Denning about the

---

[24] The court limits its analysis to Denning and Sigler's influence on Walker's decision because Harris does not allege or provide evidence that other IDOC employees acted with discriminatory animus and influenced Walker's decisions.

situation at Dwight and the relationship between Sigler and Harris. In that conversation, Denning said that she had been unable to build a team at Dwight and that Harris was unhappy. Prior to the conversation between Denning and Walker, in November 2006, Denning had sent an email to her superiors (not including Walker) detailing Harris's complaints about Sigler and Dwight. On February 26, 2007, the day before the transfer, Denning wrote another email describing Harris's complaints about Dwight and Sigler, to which Walker's executive assistant responded, "The director has told me he will address all issues regarding Harris." (Dkt. 117, ex. F.)

It is reasonable to infer from these facts that Walker's decision to transfer Harris relied on input from Denning, which in turn was influenced by Sigler's complaints about Harris. Harris's claim, however, cannot survive under the cat's paw theory because there is no evidence that Denning was biased against Harris, and Sigler's input is too attenuated to be directly linked to Harris's transfer.

### (a)      Evidence of Discriminatory Animus with Respect to Denning

Harris has not presented sufficient evidence for a reasonable jury to find that Denning acted with discriminatory animus.  Harris testified that Denning told her in October 2006 that there was a "good ole girl network" at Dwight that she did not know what to do about. (Harris dep. at 85:1-6.) Harris also claims that Denning told her that Dwight was a mess and that one of the officers that Harris complained about was "at it again," implying that he had engaged in other racially motivated conduct in the past. (*Id.* at 91:19-92:9.) In addition, Harris speculates that "Denning was irritated by Harris' constant requests for investigations" and that Denning's refusal of these requests is evidence of her bias.  (Pl. Resp. at 5.)[25]

---

[25] Harris also alleges that Denning gave Harris certain authorities when she started at Dwight and then revoked them (*see* Pl. Resp. at 18), but no inference of racial discrimination can be gleaned from this

As an initial matter, defendants object to Harris's account of Denning's comments, asserting hearsay.  Denning's statements, however, are admissions made by a party opponent, an exception authorized by Federal Rule of Evidence ("FRE") 801(d)(2)(D).   In order for the FRE 801(d)(2)(D) exception to apply, the statement must "relate to matters within the scope of the declarants' agency or employment."  *Williams* v. *Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998).  Denning's statements about issues at Dwight were within the scope of her employment because she was responsible for Dwight and was acting within the scope of her duties when she spoke to Harris, one of her subordinates, about issues at the facility.

Although Denning's alleged statements are admissible, "stray remarks do not point directly to discrimination unless the decisionmaker or one with input in the decision made the comment around the time of, or in reference to, the adverse employment action."  *Perez* v. *Thorntons, Inc.*, 731 F.3d 699, 716 (7th Cir. 2013); *see also Walker* v. *Doctors Hosp. of Hyde Park*, 110 F. Supp. 2d 704, 711 (N.D. Ill. 2000) (citing *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 277, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)).  Harris does not connect Denning's remarks to Harris's transfer over four months later.  Denning's remarks, if credited, are probative only of the fact that she acknowledged in October 2006 that there were issues at Dwight, including an officer with racial bias.  They are not probative of a discriminatory intent on Denning's part.

The remainder of Harris's evidence with respect to Denning's intent is speculative.  "Speculation is no substitute for evidence at the summary judgment stage."  *Bass* v. *Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014).  Furthermore, it is evident that Denning did

---

fact.  Indeed, the fact that Denning actively recruited Harris and gave her additional responsibilities in the first place indicates that she was not biased against Harris based on her race. *See Blasdel* v. *Northwestern Univ.*, 687 F.3d 813, 820 (7th Cir. 2012) (supervisor's hiring of plaintiff undermines inference that supervisor was biased against her).

take Harris's concerns seriously and relayed them to others at IDOC. With respect to Harris's allegations that Sigler covered up the kicking incident at Dwight, Denning suggested during an investigation into the cover-up that Sigler be removed from Dwight. (PSOF at 23-24, ¶ 45.) Taking all facts in the light most favorable to Harris, she has not presented sufficient evidence to for a reasonable jury to find that Denning acted with discriminatory animus.

### (b)    Evidence that Sigler's Actions Affected Transfer Decision

Because the court has concluded that Harris has not presented adequate evidence of discriminatory animus with respect to Denning, it must turn to whether Sigler's input could have influenced the transfer decision through two layers of bias-free review (Denning and Walker).[26] In considering whether Sigler's actions led to the transfer, it is important to remember that there is no evidence that Denning or Sigler recommended a transfer. There is no dispute, however, that Harris had requested a transfer away from Dwight. (Harris dep. 128:11-23.) In addition, Harris never alleges, and there is no evidence to support an inference, that Denning or Sigler could have influenced the position to which Harris was transferred. The fact that Harris's new position was lower ranking than the position she previously held, making the transfer an adverse action, was outside of their control.

Further removing Sigler from the transfer decision is the fact that Denning was independently familiar with Harris's work and had tried to gather information from both Sigler and Harris about their disagreements before passing them up the chain. *See Wojtanek* v. *Dist. No. 8, Int'l Ass'n of Machinists & Aerospace*, 435 F. App'x 545, 549 (7th Cir. 2011) (cat's paw theory rejected where, among other things, supervisor met separately with plaintiff to hear his

---

[26] Because the court concludes Sigler's input is too disconnected from the transfer decision to invoke cat's paw liability, the court will not address whether or not Harris has presented adequate evidence of Sigler's discriminatory animus to survive summary judgment.

side of the story); *see also Martino* v. *MCI Comm'ns Servs., Inc.*, 574 F.3d 447, 452-53 (7th Cir. 2009) (holding a reasonable jury could not have found intentional discrimination where allegedly biased individual's decision was adopted by two unbiased superiors). Harris, however, did not comply with Denning's request for a written description of her complaints.[27]

In light of these facts, Harris has failed to satisfy the proximate cause test for cat's paw liability set forth by the Supreme Court in *Staub*. *See Staub*, 131 S. Ct. at 1192-93. Because Harris cannot show that Walker's decision to transfer Harris was proximately caused by Denning or Sigler's discriminatory animus, her claim for discrimination under Title VII fails with respect to her transfer.

### 2. Decision to Terminate Harris

Walker terminated Harris in December 2008 while she was working at JMH. At the time of Harris's termination, she had not reported to Denning or Sigler in almost two years. Harris provides no evidence that ties Denning or Sigler to Walker's decision to terminate her. In fact, she concedes that they were not personally involved in the termination decision. (*See* Pl. Resp. at 16 ("Defendants claim Sigler and Denning were not personally involved in the decisions resulting in the adverse actions discussed above. For Harris' termination, that may be true.").)[28] Even making all inferences in her favor, Harris does not present sufficient evidence for a reasonable jury to conclude that Walker acted with discriminatory animus when he terminated

---

[27] Harris claims that she did not send a follow-up email to Denning because she heard that Sigler was meeting with Denning. (*See* Pl. Resp. at 3.) With no further information, it is unclear why this would excuse Harris from complying with Denning's request for a written complaint.

[28] Harris later argues that the court should infer that Sigler had a hand in the termination because of "the unusual and suspicious fact that all of Harris' personnel paperwork continued to go through Dwight and, thus, Sigler." (Pl. Resp. at 16.) But Harris does not present any evidence of how Sigler could have used her access to Harris' personnel paperwork as a means to further her alleged discriminatory animus against Harris. This fact alone is not sufficient to support a finding that Sigler acted as a "cat's paw" in the decision to terminate Harris.

her or that Denning or Sigler influenced the termination decision. Thus Harris's discrimination claim also fails with respect to her termination and summary judgment is granted in favor of defendants with respect to the entirety of Harris's Title VII discrimination claim.

## II.    Retaliation Under Title VII

Harris also alleges that she was retaliated against in violation of Title VII. As with her discrimination claim, because Harris does not present any comparators, the court must analyze her retaliation claim under the direct method. The direct method requires that Harris show (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. *See Kodl* v. *Bd. of Educ. Sch. Dist. 45*, 490 F.3d 558, 562 (7th Cir. 2007) (citing *Moser* v. *Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)).

### A.    Protected Activities

Title VII forbids retaliation against an employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Young-Gibson* v. *Bd. of Educ. of City of Chicago*, -- F. App'x ---, Nos. 13-2465 & 13-1340, 2014 WL 1814232, at *5 (7th Cir. May 8, 2014). Harris appears to assert she engaged in three activities that are protected under this provision: (1) complaining of racial discrimination to Denning, Sigler, and Sims while she was at Dwight (April 2006 – February 2007); (2) communicating with John Harris, an aide to former Illinois Governor Blagojevich, and State Senator Mattie Hunter in January 2007 about issues at Dwight; and (3) filing and prosecuting her IDHR charge, which she filed in August 2007 and refused to settle in October 2008.

### 1. Harris's Internal Complaints

Although the parties dispute whether Harris actually made complaints of discrimination and retaliation to Denning, Sigler, and Sims, taking the alleged facts in the light most favorable to Harris, complaints of racial discrimination would constitute protected conduct under Title VII. *See Durkin* v. *City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003) ("Usually a claim for retaliation is preceded by an obligatory complaint about discriminatory conduct, so that the employer is aware of the mistreatment and the corresponding protected activity.").

### 2. Harris's Comments to Illinois Politicians

The complaints to John Harris and Senator Hunter present a more complicated question.[29] With respect to Harris's complaints to Senator Hunter, Harris could not recall whether she complained about race discrimination. (*See* Harris dep. at 120:21-24.) This leaves the court with no evidence that Harris engaged in protected activity under Title VII when she communicated with Senator Hunter. Further, the complaints to John Harris and to Senator Hunter cannot support Harris's retaliation claim because there is no evidence that they were relayed to anyone at IDOC. Harris's speculation that IDOC knew about these complaints is not sufficient to survive summary judgment. *See, e.g., Good* v. *Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) ("[T]he direct method of proof . . . requires evidence leading *directly* to the conclusion that an employer was illegally motivated, without reliance on speculation.") (emphasis in original). The court thus will not consider Harris's complaints to John Harris and Senator Hunter in assessing her retaliation claim.

---

[29] Defendants object to admission of Harris's testimony regarding her communications with John Harris and Senator Hunter on hearsay grounds. Harris does not present the comments she made to John Harris and Senator Hunter for the truth of the matter asserted but rather for the impact of those comments had on her employment. Therefore the testimony does not fall within the rule against hearsay.

### 3. Harris's IDHR Charge and Refusal to Settle

Finally, while defendants admit that filing a discrimination charge is clearly protected activity under Title VII, they argue that refusal to settle that charge is not. The case cited by defendants, *Thomas* v. *South Bend Community School Corporation Board of Trustees*, No. 2:05-CV-253, 2008 WL 1774958 (N.D. Ind. Apr. 15, 2008), does not support their cause. In fact, it contemplates that a refusal to waive rights under Title VII and Section 1981 may be protected activity. *See id.* at *15. If the court were to accept defendants' argument, employers accused of discrimination could immediately offer to settle the claims for unrealistic amounts and then retaliate for refusal to settle. The court cannot accept this attempted end-run around the Title VII retaliation provisions.

### B. Adverse Employment Actions

Harris correctly asserts that the standard for adverse employment actions for retaliation is less strict than for discrimination. In making out a claim for retaliation, "an employment action is adverse if it 'well might have dissuaded a reasonable worker' from engaging in protected conduct." *Kurowski* v. *Shinseki*, No. 13-1947, 2014 WL 595774, at *3 (7th Cir. Feb. 18, 2014) (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). But "[f]ederal law protects an employee only from retaliation that produces an injury, and, therefore, an employer's retaliatory conduct is actionable only if it would be materially adverse to a reasonable employee." *Stephens* v. *Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (citing *Burlington*, 548 U.S. at 68-69). The court applies "an objective test, but whether a particular action is materially adverse will depend on the context and circumstances of the particular case." *Id.*

Again, the parties do not dispute that Harris's termination in December 2008 qualifies as an adverse action. In addition, the oral reprimand (April 13, 2007), the less favorable performance evaluation (May 3, 2007), and the transfer to JMH (February 2007) each satisfies the requirement for an adverse action in making out a retaliation claim. The court thus will address whether Harris has presented sufficient evidence of a causal connection between any protected activity and any adverse action below.

## C.    Causal Connection

Harris must show that her "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, -- U.S. ----, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013). In other words, to succeed on her retaliation claim Harris must show that the adverse employment actions would not have occurred absent her protected activities. *See Hnin* v. *TOA (USA), LLC*, --- F.3d ---, No. 13-3658, 2014 WL 1758457, at *7 (7th Cir. May 5, 2014) ("Retaliation claims under Title VII require traditional but-for causation, not a lesser 'motivating factor' standard of causation.") (internal quotation marks and citation omitted); *Isbell* v. *John Crane, Inc.*, -- F. Supp. 2d ----, No. 11 C 2347, 2014 WL 1153064, at *8 (N.D. Ill. Mar. 21, 2014) (plaintiff alleging disability, sex, and retaliation claims required to prove "that she would not have been terminated for her frequent tardiness had she not filed complaints with the EEOC").

### 1.    Oral Reprimand

Walker directed Denning to give Harris an oral reprimand as a result of an incident in which Harris left an inmate in a cell without water or a toilet for five hours. Harris admits that the incident occurred. Harris does not provide facts sufficient for a reasonable jury to conclude that her protected activities were the cause of the oral reprimand. In fact, before Harris was

reprimanded, the incident was investigated and the investigator concluded that Harris had violated IDOC rules and standards. Although Harris does allege that the investigation was a "sham," a plaintiff's subjective belief that adverse employment actions were discriminatory or retaliatory is insufficient to create a triable issue of fact. *See Hosick*, 924 F. Supp. 2d at 977 (citing *Horowitz* v. *Bd. of Educ. Avoca Sch. Dist. No. 37*, 260 F.3d 602, 615-16 (7th Cir. 2001); *Kizer* v. *Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992)). No reasonable jury could conclude that the oral reprimand was retaliatory.

### 2. Performance Evaluation

Similarly, Harris provides no causal link between her "acceptable" performance evaluation and her complaints to Denning, Sigler, and Sims.[30] Although Sigler had input into Harris's performance evaluation, Denning rejected Sigler's suggested "unacceptable" performance evaluation and, after reviewing her decision with other executives at IDOC, gave Harris an "acceptable" rating. While the performance evaluation did trail Harris's alleged complaints to Denning, Sigler, and Sims about racial discrimination, there is no indication that it "would not have been issued but for her complaints." *Chaib*, 744 F.3d at 987 (rejecting retaliation claim with respect to plaintiff's poor performance review, even where review includes complaints about plaintiff's ability to work as a team member which could be an indicator of discrimination). In fact, Sigler provided a lengthy written justification for her proposed rating in preparation for the evaluation, and Harris received a higher rating because of intervention by Denning, who also knew of Harris's alleged protected activity. These facts could not lead a reasonable jury to conclude that retaliation was the but-for cause of her "acceptable" performance evaluation.

---

[30] The performance evaluation was given before Harris filed an IDHR charge and thus there is no possibility that the poor evaluation was given in retaliation for the charge.

### 3. Transfer Back To JMH

Harris was transferred after her complaints to Denning, Sigler, and Sims but she fails to tie her transfer to the complaints. Walker made the decision to transfer Harris and there is no evidence that Denning or Sigler passed on any of Harris's alleged complaints about racial discrimination to him. Harris asks the court to infer that Walker was aware of Harris's complaints because he was copied on investigation reports about prisoner abuse and cover-ups, but Harris does not point the court to any mention of her complaints of discrimination in the report cited and the court was not able to find any mention that would inform Walker that Harris engaged in protected activity even if he did read the entire report. In addition, these reports do not relate to instances of unlawful employment practices as required to satisfy Title VII's retaliation provision. *See* 42 U.S.C. § 2000e-3(a).

Harris further argues that her complaints to Sims were relayed to Walker because "Sims had a direct line to the Director" and Sims told her she was talking to Walker. (Dkt. 123 at 13, ¶22). Sims, however, denies that she ever discussed the complaints with Walker (*see* Sims dep. at 42:10-45:10). Harris provides no evidence to rebut Sims' testimony. Harris's claim cannot survive summary judgment based only on her speculation. *See Wilcox* v. *Allstate Corp.*, No. 11 C 814, 2012 WL 6569729, at *18 (N.D. Ill. Dec. 17, 2012) (speculation is not sufficient for retaliation claim to survive summary judgment) (citing *Springer* v. *Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)).

### 4. Termination

Finally, Harris argues that she was terminated in retaliation for refusing to settle her IDHR proceedings. Harris's testimony provides the only evidence with respect to the rejected settlement offer. She testified that in late October 2008, she received an offer to settle from

IDOC, which included a transfer to the position of assistant chief of inmate records.  (*See* Harris

dep. at 166:3-8, 362:16-363:22.)  After some negotiation about the salary, she told the IDHR

mediator that she would not accept the offer because the proposed salary was less than what her

predecessor made.  (*Id.*)  It is unclear from the evidence presented whether the offer and the

ensuing negotiations and rejection occurred before or after the October 17 incident at JMH

during which Harris reprimanded a corrections officer and which is the proffered justification for

Harris's termination.[31]  Harris asks that the court make two inferences in support of her

retaliatory termination claim.

First, Harris asks the court to infer that "Walker presumably knew about the [settlement]

proposal and Harris' rejection[.]"  (*Id.*)  Generally, courts will not make this type of presumption.

*See Brown* v. *Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (rejecting

retaliation claim and refusing to infer that decisionmaker knew of plaintiffs' discrimination

complaints because they had been covered in the local news and the subject of workplace

chatter).  In this case, however, Walker appears to have been involved in all employment

decisions regarding Harris, and it seems reasonable for a jury to infer that he would have also

known about the offer to settle the IDHR charge (and her ultimate refusal of the offer) because it

included a proposed change in Harris's position.[32]  In light of this fact, a reasonable jury could

infer that Walker knew of Harris's rejection of the offer to settle her IDHR charge.

Second, Harris asks the court to infer that the timing of her termination was suspicious

because she was terminated only one or two months after she rejected IDOC's settlement offer.

_____

[31] Defendants seem to admit that the offer occurred after the October 17 incident (*see* dkt. 113 at
14 ("Hurt recommended Plaintiff's termination, and thereafter, Plaintiff rejected the settlement offer."))
but the parties do not provide any substantiating evidence as to the exact date of the settlement offer and
Harris's refusal of the offer.

[32] Also, Harris did not have the opportunity to examine Walker about what he knew because he
passed away during the discovery period.

"Although rarely sufficient on its own, suspicious timing may be circumstantial evidence of retaliation." *Young-Gibson*, 2014 WL 1814232, at *5 (citing *Kidwell* v. *Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 489, 184 (2012); *Leitgen* v. *Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011)); *see also Oest*, 240 F.3d at 616 ("[S]peculation based on suspicious timing alone does not support a reasonable inference of retaliation; a causal link, again, is required.") (internal quotation marks and citations omitted).

The suspicious timing in this case is bolstered by additional suspicious facts. For example, it is impossible to determine whether Harris received or rejected the settlement offer before or after the October 17 incident that allegedly prompted her termination. If IDOC did offer her a different job after the incident, it would call into question defendants' justification for Harris's termination. In addition, defendants never address the inconsistencies in the description of the October 17 incident. Hurt describes a face-to-face confrontation, while the incident reports indicate that the confrontation occurred over the phone. Finally, there is merit to Harris's argument that, if the incident was so serious, it is suspicious that she was not terminated until two months later. *See Peirick* v. *Ind. State Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 692-93 (7th Cir. 2007) (employer's delay in addressing concerns undermines claim that these concerns were true reason for adverse action).

Harris has marshalled sufficient facts to allow a reasonable jury to infer a causal connection between her rejection of the offer to settle her IDHR charge and her termination. She has not, however, shown that a reasonable jury could find that she was retaliated against with respect to any other adverse action. Defendants' summary judgment motion is granted with respect to Harris's retaliation claim except with respect to her claim for retaliatory termination as a result of her refusal to settle her IDHR charge.

### III.   Section 1981 and Section 1983

The court dismissed Harris's Section 1981 and Section 1983 claims against IDOC and the individual defendants in their official capacity.  (*See* dkt. 34 at 6.)  Thus the court need only address Sigler's and Denning's personal liability with respect to the Section 1981 and Section 1983 claims.

The substantive standards governing discrimination and retaliation claims under Title VII apply equally to claims under Section 1981 and Section 1983.  *See Hall* v. *Vill. of Flossmoor, Ill.*, 520 F. App'x 468, 470 (7th Cir. 2013) (citing *Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (Section 1981); *Davis* v. *Wisc. Dep't of Corr.*, 445 F.3d 971, 976 (7th Cir. 2006) (Section 1983)).  In order for an individual to be personally liable under Section 1981 or Section 1983, he or she must have been involved in the alleged constitutional violation.  *See Hildebrandt* v. *Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003).  Personal involvement exists where the misconduct "occurs at [his] direction or with [his] knowledge and consent.  That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye."  *Id.* (alterations in original) (quoting *Gentry* v. *Duckworth*, 65 F.3d 555, 561 (7th Cir. 1991)).

As discussed above, only Harris's claim of retaliation with respect to her termination survives summary judgment.  Harris provides no facts that support a finding that Denning or Sigler were personally involved in her termination.  The termination occurred after Harris left Dwight, and there is no indication that the termination occurred because of any actions taken by Sigler or Denning (or even that any actions they took contributed to her termination).  The court grants summary judgment to defendants with respect to Harris's claims against Sigler and

Denning under Section 1981 and 1983 because they were not personally involved in the alleged misconduct.

## IV.     Ethics Act

Harris also asserts a claim for violation of the Ethics Act, alleging that the defendants retaliated against her for reporting misconduct at Dwight.  In its opinion on defendants' motion to dismiss, the court narrowed the claim to include only allegations of retaliation for protected conduct that did not involve complaints of race discrimination.  (*See* dkt. 34 at 15-16.)

Defendants argue that summary judgment should be granted in favor of IDOC on the Ethics Act claim because it is barred by sovereign immunity under the Eleventh Amendment.  To the extent Harris is seeking damages from the state (which includes IDOC and Denning and Sigler in their official capacities), the court agrees.  *See Hosick* v. *Chicago State Univ.*, No. 10 C 5132, 2011 WL 6337776, at *7 (N.D. Ill. Dec. 19, 2011); *Titus* v. *Ill. Dep't of Transp.*, 828 F. Supp. 2d 957, 974 (N.D. Ill. 2011).  But the Eleventh Amendment does not preclude claims for injunctive relief.  *See Benjamin* v. *Ill. Dep't of Fin. & Prof'l Regulation*, 837 F. Supp. 2d 840, 852 (N.D. Ill. 2011).  Because Harris has requested injunctive relief, her Ethics Act claim against IDOC and Denning and Sigler (in their official capacities) survives defendants' sovereign immunity challenge with respect to the injunctive relief.  Because Denning and Sigler in their individual capacities cannot grant the injunctive relief requested, the Ethics Act claim, to the extent it is seeking injunctive relief, fails against Denning and Sigler in their individual capacities.  *See id.* at 852.  The two individual defendants may be sued for damages under the Ethics Act, however.  *Id.*

Because defendants raised no substantive arguments with respect to Harris's Ethics Act claim in their motion for summary judgment, the court will not proceed to discuss the merits of

the claim.  Defendants' motion for summary judgment is denied with respect to Harris's Ethics Act claim, which may proceed against IDOC and Denning and Sigler in their official capacities on the injunctive relief, and against Denning and Sigler in their individual capacities for damages.

## CONCLUSION

Defendants' motion for summary judgment is granted on all claims other than (1) Harris's claim for retaliation in violation of Title VII with respect to her termination and (2) her Ethics Act claim.  In light of the significantly narrowed scope of this suit, the parties should consult regarding a consensual resolution of the remaining claims.  Parties will report on the status of their discussions at a status hearing on July 1, 2014 at 11:00 a.m.


Date:  June 18, 2014

_____